MARGIE C. MARTIN *v.* JAMES ARTHUR ROCHELLE
ET AL

5-5365                                    460 S. W. 2d 70

Opinion delivered November 23, 1970

*Chambers & Chambers,* for appellant.

*Jerry A. Rochelle* and *Wheeler, Watkins, Hubbard, Patton & Peek,* for appellee.

LYLE BROWN, Justice. This suit was initiated by appellant, Margie C. Martin, against her sister and the latter's husband, Mavis Cochrell Rochelle and James Arthur Rochelle, appellees. During his lifetime, H. K. Cochrell, the father of the two girls (his only heirs), conveyed forty acres of land to Mavis and her husband, James. Margie sought to set aside the transaction on the grounds of (1) lack of adequate consideration, (2) mental incapacity of H. K. Cochrell to make the conveyance, and (3) undue influence exerted over the father by appellees. On appeal Margie contends she should have been granted relief because she established her allegations by a preponderance of the evidence. She also alleges error by the chancellor in admitting the evidence of three witnesses who sat in the courtroom during part of the trial notwithstanding the court had placed all witnesses under the rule.

The father, H. K. Cochrell, was widowed in 1952, and lived alone near Taylor, Arkansas, in Columbia County. He raised livestock, leased out his forty acres (which was all the land he owned), and sold small amounts of timber. In about 1962, Cochrell became ill and was hospitalized for several months for tuberculosis. From 1962 until his death in January 1968, he was treated at Veterans Hospital in Shreveport, by a doctor in Springhill, Louisiana, and by Dr. Short in Texarkana.

It is apparent that his chest problem lingered with him until his death. When Cochrell was not in the hospital during those six years he divided his time between the homes of his two daughters; however, he lived most of the time with the appellee daughter because appellant testified she was not really able to care for her father and his needs. Appellee James Rochelle purchased a trailer and placed it on his property in Texarkana, where he resided, so that Cochrell would have a place to stay when he visited his daughter there. Cochrell's favorite doctor —Dr. Short—practiced in Texarkana, and he saw Cochrell as a patient many times during those six years.

Cochrell executed two deeds to the forty acres, both to his daughter and son-in-law, appellees, the second allegedly to correct errors in the first. Rochelle testified that in about 1963 Cochrell offered to give the land to appellee Mavis Rochelle in gratitude for some $2,000 the Rochelles had expended for Cochrell's medical bills and other items. Apparently the Rochelles declined to take the property. Then in 1964 Cochrell offered to sell it to them for $1,000. Rochelle described the transaction in this manner:

I gave him $100 at the time I accepted his offer. He went to a law office and had the deed prepared. When the deed was delivered the balance was paid in cash. The deed was made out to Mrs. Rochelle, my wife, and she told her father she wanted it in both our names. Her father took the deed back home with him and the next time he came to see us he brought the deed back with my name inserted. I put the deed away without recording it and several months later I was looking at it and noticed Mr. Cochrell's name had been misspelled. When I subsequently called it to Mr. Cochrell's attention he said he would get another deed made. An undetermined time elapsed and on a subsequent trip to Texarkana, Cochrell inquired where he could get a deed drafted. He was referred by me to Lawyers Title Company in Texarkana and the deed was there prepared and delivered in 1967. In the second deed, Cochrell reserved a life estate in ten acres of the oil, gas, and other minerals, which was not

done in the first deed. The latter deed was recorded on March 7, 1968, approximately one month after the death of Mr. Cochrell.

The Rochelles did not destroy, nor did they file for record, the first deed; however, they decided to place it of record about two weeks before this case was tried by the chancellor, namely, October 30, 1969.

Appellant lists seven points for reversal:

1. The court erred in permitting witnesses to remain in the courtroom and testify after the court had ordered all witnesses who were not parties to the suit to leave the courtroom.

2. The court erred in admitting in evidence two deeds that were in conflict.

3. The lower court erred in admitting an altered deed.

4. The court erred in not cancelling the deeds for failure of fair consideration.

5. The court erred in not cancelling the deeds for use of undue influence.

6. The lower court erred in not cancelling the deeds for mental incapacity to execute the deed.

7. The court erred in allowing testimony contradictory of the consideration recited in the deed.

The first point, relating to the exclusion of witnesses, centered upon a brief procedure which we summarize. Appellees, at the beginning of the trial, asked that the rule be invoked as to the witnesses. Thereupon the court announced: "All the witnesses who expect to testify here today, and who are not a party to this law suit, will leave the courtroom during the trial of this case." The one-day trial was started and the appellant

proffered her testimony in a matter of a few hours. The first witness for appellees was James Arthur Rochelle. Then when Dr. Harold Short, the next witness, was called for appellees, Attorney Chambers, on behalf of appellant, objected to the testimony of that witness, along with the anticipated testimony of witnesses Souter and Jennings, on the ground that those three witnesses had been in the courtroom during the testimony of Rochelle. "The defendant [appellee here]," related Mr. Chambers, "asked for the rule and the plaintiff's witnesses were excluded from the courtroom and have been under the rule." The court reminded Mr. Chambers that he had not asked for the rule on behalf of appellant.

In the first place, appellant's counsel never asked for the rule. Ark. Stat. Ann. § 28-702 (Repl. 1962) governs the rule on witnesses in civil cases. "If either party requires it, the judge may exclude from the courtroom any witness of the adverse party . . ." So when counsel for appellees asked for the rule the judge was authorized, in his discretion, to exclude *appellant's witnesses,* not those of appellees. Secondly, it is not shown that appellees' witnesses were even in the courtroom at the time the announcement was made or that they otherwise had knowledge of the rule. From the colloquy between court and counsel it is apparent that appellees' witnesses entered the courtroom at a time when the trial was in progress. In fact it is stated in the record that the objectionable witnesses first entered the courtroom during the testimony of Rochelle. It was so stated by counsel for appellant. That would have been the time to have invoked the rule as to those witnesses, rather than waiting until Rochelle's testimony had been completed. Certainly we cannot say that the chancellor abused his broad discretion in permitting the witnesses to testify. See *St. Louis, I. M. & S. Ry.* v. *Pate,* 90 Ark. 135, 118 S. W. 260 (1909); Wigmore on Evidence, Vol. 6, § 1842 (1940). The recited authorities look with some disfavor on the disqualification of a witness in a civil case solely because he has unwittingly violated the rule of exclusion.

Points 2, 3, and 7 are listed in appellant's brief but neither of them is argued for reversal.

Points 4, 5, and 6 are combined by appellant for purposes of argument and we shall treat them as one. They concern the allegations of inadequate consideration, undue influence, and mental incapacity of H. K. Cochrell, the maker of the conveyances.

The most detailed witness for appellant regarding Cochrell's physical and mental problems was Margie C. Martin. Here is a fair abstract of her testimony:

Father started going down in 1962 from the time he had tuberculosis and was in VA Hospital; at times he would be all right and other times he wasn't. He improved somewhat but went back to the hospital in 1964 and from that time he got worse. He should have been staying with someone all the time but he took spells when he wanted to stay by himself. He would not take his medicine unless some of us were around. I could tell his mind was failing. He could not remember things he told me. He had severe headaches. He would not stay in the hospital. He talked about a lot of business matters that I knew wasn't right. He talked to me about the deed he made to Mavis. He said he made it to Mavis before I quit my husband, but now that we were separated things were different. He said he had the deed at home, that it wasn't any good, and that he would make the land to Mavis and me. About his condition around September 1967, Father was very confused. He would send for me and when I would arrive he couldn't remember having sent for me. He complained of headaches and said "if something ain't done you ain't going to have your dad here long." He was sixty seven when he died in 1968.

Mrs. Annis Disotell, age 70 years, and a sister of Mr. Cochrell, was called by appellant. She was a neighbor of her brother and stated that during the last few years of his life he visited her house often; that he had given Mavis a deed but had changed his mind and would see that it was not recorded; that a few days after Mr. Cochrell died, James Rochelle related to her that he had procured a second deed from Cochrell and it was prepared the way Rochelle wanted it. This witness expressed no opinion as to Cochrell's health during his last years.

Witness Delores Nix, another neighbor of Cochrell near Taylor, related that Cochrell had told her about the first deed he made to Mavis; that he had it in his possession; that he had changed his mind and was not going to have it recorded. She also said she drove him to town several times when he expressed a desire to pay his grocery bill; that he would leave without paying it; and that at one time she took him to the funeral home to pay his burial dues and they were already paid.

Witness Jeff Fish testified that he knew Cochrell the last several years of the latter's life; that he was in poor health and "wasn't at himself like a man would be if he wasn't sick"; and that he would not have, during that period, made a business deal with Cochrell without the consent of his family, "not for several months before he died."

Harold and J. R. Nations, brothers engaged in the buying of timber lands, testified as to their familiarity with Cochrell's forty acres; that $25 per acre was considerably under fair market value; and in fact they valued it at $75 to $100 per acre in 1964 and at $125 to $150 an acre in 1967. J. R. further testified that Cochrell's mind was not normal during the last few years, but that when Cochrell was sober it might have been safe to make a business deal with him.

On the question of mental capacity, appellees presented four witnesses. James Rochelle testified that he married Cochrell's daughter in 1942; that he and Cochrell had been around each other quite often over the years; and that Cochrell was normal mentally the last years of life, just as much so as he was throughout their years of acquaintance. He agreed that Cochrell was weak from illness from 1962, but that otherwise he showed no abnormality.

Dr. Harold Short of Texarkana testified that he treated Mr. Cochrell from 1962 until 1968; that the number of professional visits ranged from twenty to thirty; that Cochrell had a case of advanced tuberculosis in 1962

but there was no indication of a mental disorder; that in 1964 the patient was again treated for chest infections, and again his mental processes appeared normal; that in January 1968 Dr. Short went to the Rochelle home in Texarkana and discussed with Cochrell and Mrs. Rochelle the desirability of sending Cochrell to a veterans' hospital for further treatment; and that he detected nothing wrong with Cochrell mentally. Dr. Short concluded by stating that from 1962 until 1968, Cochrell "was of sound mind and capable of performing his business functions." On cross-examination Dr. Short identified a letter written by one of his partners in which it was stated that Cochrell was suffering from chronic lung disease and superimposed infection, along with mental confusion, all of which necessitated hospital care. That letter was written for the purpose of gaining the patient admission into the VA Hospital. He was immediately admitted and died within two days after the letter was written.

Another witness for appellees was Willie Souter, a Cochrell neighbor at Taylor for nineteen years. He testified that he saw and talked with Cochrell about once each month during the last six years of Cochrell's life; that he never noticed anything unusual about Cochrell; and that in his opinion Cochrell was as capable as ever to attend to his business. Austin Jennings, a filling station operator at Taylor, testified substantially the same as Souter.

On the issue of mental competency we are certainly unable to say that the finding of the chancellor is against the greater weight of the evidence. That conclusion was based on the testimony of four witnesses who were well acquainted, and often associated, with Mr. Cochrell. It included the testimony of a medical doctor who had seen Cochrell as a patient some twenty or thirty times from 1962 until early 1968. It is true that medical evidence indicated that Cochrell was confused mentally two days before he died, but it must be remembered that Cochrell was then critically ill; and also we are concerned with his mental condition back in those years in which he made the conveyances.

Little need be said of the allegation of undue influence. We are simply unable to find, except possibly by inference, any evidence to support the point. Appellant argues that James Rochelle was Cochrell's son-in-law; that Rochelle "is a polished man in conversation" and that he had "all opportunity he needed to have helped agitate Mr. Cochrell against the appellant's husband," whom Cochrell did not like. Even if those facts were true, they would make no case for a finding of undue influence. We have not overlooked the contention of appellant that the amount of the consideration sheds light on the issue of undue influence; however, that contention is based on the assumption that $1,000 is the sum total of the consideration for the conveyance.

*Inadequacy of Consideration.* Appellant's position that the recited $1,000 as consideration precludes parol testimony to establish additional consideration is not tenable. When a consideration is recited, parol evidence may not be utilized to show no consideration; otherwise, parol testimony is proper to show the true consideration upon which a deed rests. *Mitchell* v. *Smith*, 206 Ark. 936, 175 S. W. 2d 201 (1943); *Whitlock* v. *Barham & Duncan*, 172 Ark. 198, 288 S. W. 4 (1926). It was appellees' contention—and they offered evidence to that effect—that by 1963 the Rochelles had boarded Cochrell at various and frequent times and had expended considerable sums for his medical bills; and that he wanted to give the Rochelles the land "because of what we had done for him." Then in 1964, Cochrell was said to have wanted some cash and approached the Rochelles to buy his land at a figure which he set at $1,000. Thus there was evidence of far more consideration for the conveyance than that which was recited, and it was proper for the court to consider that testimony.

Affirmed.